## WILLIAM CONANT *v.* THE BELLOWS FALLS CANAL COMPANY.

### [ IN CHANCERY. ]

*Corporations.   Agreement to lease real estate.   Ratification.   Specific performance.*

An agreement for a lease of real estate from a corporation is not required to be executed or assented to by the corporation with the same formality as the lease itself.

If such an agreement is made in the name of a corporation by one acting as their agent, but without authority, and without the formalities required in the execution of an actual lease, it may be subsequently ratified by the corporation, and if so ratified a court of chancery will require a specific performance of it.

An agent of the defendants agreed to lease to the orator for a term of years certain real estate belonging to the defendants, and a water-privilege connected with it, upon the faith of which the orator went on and made permanent erections, of

which the defendants were cognizant, and for the use of the premises they for several years received the rent as stipulated in the agreement. *Held,* that though the agent might not have had authority to make such an agreement, that the contract itself might be ratified by the defendants, and that they had ratified it by permitting the erections and receiving the rent.

A court of equity will not decree the specific performance of a contract which it is not in the power of the party to perform, *e. g.,* to convey a right which has already been conveyed to another; but this principle held inapplicable to the orator's claim in the present case.

APPEAL FROM THE COURT OF CHANCERY. The bill charged that the defendants on the 1st of August, 1850, owned, or claimed to own a canal leading from Connecticut River above the village of Bellows Falls to the same river below said village, and also lands adjacent to said canal; that the orator on that day wanted to hire water-power and land whereon to erect a building for mechanical purposes with machinery to be run by water-power, and the defendants agreed to grant the same to him, and that thereupon the orator and A. Fleming, the agent of the defendants, signed the following agreement:

"This agreement made this first day of August, 1850, between William Conant of Bellows Falls, Vermont, on the one part, and the Bellows Falls Canal Company on the other part, witnesseth: 1st. The Canal Company agree to lease to said Conant the land on which the work-shop lately stood between the foundry and the saw mill, for the purpose of erecting a building thereon; and also the privilege of taking water from the canal sufficient to run the three wheels at present in said building upon water saving principles, and not to exceed one hundred and forty-four inches for each wheel, for ten years from 1st January, 1850. 2d. The said Conant is to have the use of a space of eight feet wide on each side of the building when necessary, for the purpose of repairs, &c. 3d. The said Conant agrees to pay said Canal Company the sum of one hundred dollars per annum for the use of the land and water aforesaid, commencing at the date hereof. 4th. If at the expiration of the ten years the said Canal Company shall decline renewing this lease, the said Canal Company shall take the said building, wheels, geering, &c., and pay said Conant the appraised value thereof without reference to water-power. 5th. In case of

a stoppage of water for extraordinary repairs, rent to cease during said stoppage, and said Conant to have no claim for damages on that account.   6th.  The said Conant agrees not to hinder or impede the navigation of the canal in any way.   7th.  The said Conant is to have the privilege of erecting a foot bridge across the canal to the said building, the same not to interfere with the navigation or passage to saw mill.

"A. FLEMING, agent for B. Falls Canal Co.
"WILLIAM CONANT."

The bill further charged that the orator, relying upon receiving a lease after said agreement, went on with the full knowledge and approbation of the defendants and took possession of the land, erected a building, put in machinery, made a flume and other fixtures for the purpose of carrying the water from the canal to the wheel beneath the building, at an expense of ten thousand dollars, and had since laid out large sums in repairs, and had paid to the defendants the rent mentioned in said agreement; that the orator had always been ready to perform his part of said agreement and accept a lease, and caused a draft of a lease to be presented to the defendants, who refused to execute the same; that the orator had frequently asked the defendants for a lease which they refused to give, and that he had also offered to sell them his building for a reasonable price and release them from their agreement; that the orator continued in the use of the land and water till January, 1853, when the defendants shut off the water and compelled him and all his help to lay idle for a long time, but finally permitted him to have the use of the water again; and that at the time of bringing said bill they again threatened to prevent the orator from using said water, and for that purpose were about shutting the water in the canal out of the orator's flume.

The bill prayed that the defendants might be decreed to perform said contract and execute a lease, &c.; the orator offering to execute a counterpart, &c.; and that in case the defendants were not able to make a good title to the demised premises, that an account might be taken of all the orator's expenditures upon said building, &c., and the defendants be decreed to pay all sums of money so found, with interest, to the orator; and that the defendants be

enjoined from shutting the water off from the orator's wheels; and for further relief, &c.

The defendants answered that they were incorporated October 25th, 1792, by the name of "The Company for rendering Connecticut River navigable by Bellows Falls;" that they owned the canal and lands adjacent thereto, as mentioned in the bill; that by an act passed November 9, 1831, they were authorized to take the name of "The Bellows Falls Canal Company;" and also by said act were authorized to lease &c. water power and lands &c. under their common seal by an agent specially empowered for that purpose, whose deed recorded in the town clerk's office and in the books of the company should be valid; and also that the company might in like manner execute any instrument &c. in relation to their affairs, which act among the laws of 1831 (Laws of 1831, 101), the defendants referred to. The defendants further answered that February 28th, 1832, they sold to John Carey a site for a grist mill, with a privilege of taking water to carry three run of stones, a smut mill and a corn cracker; and stipulated that no grant should be made to any other person for a like purpose; that said Carey erected a mill on said site, and that he and his assigns have continued it ever since; that March 10th, 1835, the defendants granted to said Carey and his assigns the further privilege of taking water enough to carry a fourth run of stones, and that it was covenanted that said Carey and his assigns should have the prior right to the use of said water in preference to any right of taking water thereafter to be granted, to which deed the defendants referred; that afterwards by mesne conveyances, the title of Carey to said mill, &c., became vested in Frazier & Billings, who then owned the same; that September 20th, 1837, the orator obtained license from the officers of the company to put a wheel under the north-east corner of the company's saw mill to run the machinery in his cabinet shop, for the space of ten years, and that the orator continued so to use the water for ten years, and until May 1st, 1850. The defendants admitted that August 1st, 1850, the orator and Alexander Fleming executed the agreement set forth in the bill, but averred that said Fleming was then the clerk, but not a director of the company, nor their agent, and that he had no authority to bind the company; and that the company

had not done anything to preclude them from fulfilling their engagements with Carey and his assigns, or to diminish the supply of water theretofore granted by them to Carey; that said agreement had never been sanctioned by a vote of the company for the reason of the omission of any stipulation that the taking of the water by the orator should not interfere with the grant to Carey; that the defendants were informed by Fleming that the agreement with the orator was made with the express understanding that the right of the orator to the water should not interfere with the prior right granted to the grist mill; and finding that the orator until the time hereafter mentioned whenever there was a deficiency of water shut his gates until the grist mill was supplied, they made no objection to his use of the water and received the rent therefor; that in January, 1851, a freshet occurred and the ice blocked up the canal and caused a deficiency of water; and that the orator, with other persons on the canal having rights to use the water, united in shutting their gates until the grist mill was supplied, and also united to clear out the ice from the canal at their own expense; that in January, 1852, there was another freshet and the canal was again blocked up by ice, at which time the orator refused to shut his gates, and by reason thereof there was a deficiency of water at the grist mill, and the water froze up, and the defendants were obliged to pay damages to Frazier & Billings, the owners of the grist mill; and the orator then for the first time claimed that he had a right to take as much water as he neeeed to run his works irrespective of the rights of the grist mill. The defendants admitted that in January, 1854, they shut off the water from the orator's works, but insisted that they were obliged to do so as the only way of letting enough water run to the grist mill, and that in a few days the orator opened the gates again and threatened the employees of the company with injury if they shut them again, and that they have continued open ever since. The defendants also admitted the presentation to them of the lease and their refusal to execute it; but they averred that such refusal was because the lease, if executed, was intended to be used in an action at law against them for attempting to grant privileges which the orator knew would interfere with rights before granted to the grist mill; and that the defendants offered to exe-

cute a lease to the orator conformable in all respects to said agreement, with the stipulation that the orator's use of the water should not interfere with the rights previously granted to the grist mill, which lease the orator refused to accept. The defendants submitted whether, inasmuch as the orator could not by any lease from them deprive Frazier & Billings of the right to use the quantity of water before granted to them, but would be subject to be restrained by injunction from so doing, he was entitled to a decree ordering the execution of such lease; and they denied all unlawful combination, &c.

The answer of the defendants was traversed, and testimony was taken and various exhibits were filed, none of which require to be stated or set forth more fully than they are in the opinion of the court, unless it be the contract between the orator and the defendants, dated September 20, 1837, which is referred to in the answer of the defendants and in the opinion of the court, and which contract was as follows:

"Agreement between the Bellows Falls Canal Company on the one part, and William Conant, of Rockingham, county of Windham, and state of Vermont, on the other part, witnesseth:

"That the said Bellows Falls Canal Company grant to said the privilege of putting in a wheel under the north-east corner of their saw mill and connecting the same with his cabinet maker's shop by means of bands, &c., and of drawing water, say not exceeding one square foot, from the canal, for the purpose of carrying said wheel, for the term of ten years from October 1st, 1837, the whole cost of the spout, wheel, gearing, wheelpit, &c., &c., to be at the expense of the said Conant.

"That the said Conant in consideration of the above grant of water agrees to pay the said Canal Company therefor twenty-five dollars annually.

"It is agreed between the parties that in case the said Canal Company shall at any time previous to the expiration of the ten years deprive the said Conant of the privilege aforesaid, they shall be bound in lieu of all damages for so doing to purchase of said Conant the wheel, gearing, bands, lathes, and such other articles connected therewith (a list of which shall be annexed hereto, and

the first cost of which shall not exceed five hundred dollars), at the cost thereof, deducting such amount for wear and tear thereof as may be deemed reasonable.

" It is also agreed that the bands and the box through which they pass shall be placed and kept at such a height as to offer no impediment to the navigation, or the ordinary business of the mills ; and that the said Canal Company shall have the privilege of stopping the supply of water hereby granted whenever it may be necessary for the purpose of repairs, &c., &c., and whenever the same may be required for the purpose of navigation.

" It is understood that the spout for carrying the water from the canal shall be inserted as near the bottom of the canal as may be convenient, and the gate thereof shall be guaged to make the supply of water equivalent to one foot square under a four foot head, and also that in case the said company should at any time avail themselves of the privilege aforementioned of stopping the supply of water, they shall be bound to give him six months' notice of their intention to do so.

" It is also further understood that the water is to be used only for the purpose aforesaid, and not to be drawn at any time for the purpose of catching fish.

·  " Bellows Falls, September 20, 1837.

" GREEN & FLEMING,

" Agents B. Falls Canal Co.

" WILLIAM CONANT."

The court of chancery dismissed the orator's bill, from which decree of dismissal the orator appealed.

*H. E. Stoughton,* for the orator.

*D. & G. B. Kellogg* and *W. C. Bradley,* for the defendants.

The opinion of the court was delivered by

REDFIELD, CH. J.   The making of such a contract as the plaintiff asks to have specifically carried into effect by Fleming, the general business agent of the company, is admitted.   One important question in the case is, whether he was authorized to

make such contract, and if not, whether it is capable of being ratified by the company, by acquiescence, so as to become binding upon them; and if so, whether the proof in this case amounts to such ratification.

The statute of 1831, sec. 3, gives the company power to convey land, and to lease it by deed of an agent appointed for that purpose by vote of the corporation under their common seal. This mode, or else the mode pointed out in the general statutes of the state in regard to the conveying of real estate by corporations, should undoubtedly be pursued in the actual conveyance or leasing of the real estate of the corporation.

But it has been held in this state that a contract to convey land by a corporation is not required to be executed or ratified with the same formality as the actual conveyance; *Isham* v. *Bennington Iron Company*, 19 Vt. 230. If the company are cognizant, or its principal agents and officers are cognizant of some third party being upon their land, making permanent erections under a claim of title, and make no objections, it has been held a ratification of a sale or contract to convey made by their agent; *Pope* v. *Henry*, 24 Vt. 560, 566.

In the present case there was this and the payment of rent to the company. So that it would seem there was, at all events, a sufficient ratification to bind the company.

Fleming states that he was general agent of the company in all their business except making out conveyances, when special agents were appointed. And he had been sometimes appointed special agent for that purpose. The only right to use water which the company have sold is to the grist mill, but they have been in the habit of leasing for ten years.

In September, 1837, a contract was made with the plaintiff to have him use one square foot of water under the saw mill to carry a wheel in his cabinet shop, by means of a band.

He says according to his best knowledge and belief it was well understood between him and Mr. Conant that the grist mill had the first right in low water, and when requested he must shut down his gate. But no such exception seems to have been contained in this contract, and none in the present one. And if there had been any express exception in the making of the contract in

the first instance in favor of the prior right of the grist mill Mr. Fleming would not have expressed himself in the manner he did.

On the first day of August, 1850, the present contract was made, upon which the plaintiff erected a three story building with three wheels, for which he was to draw from the bottom of the canal not exceeding one hundred and forty-four inches for each wheel. This contract was made upon the same conditions as the one of 1837, and rents have been paid the company up to February, 1854.

After the plaintiff refused to acknowledge the prior right of the grist mill as a condition of his contract, the company declined to ratify it or to execute a lease except with that condition.

And the question to be determined is whether the plaintiff has the right to insist upon a lease in the form in which his contract specifies, without condition or qualification.

As we have said that a contract for a lease need not be in the same form as the lease itself, or supported by a formal vote, the principal inquiry is whether the evidence is sufficient to bind the company to the contract as made. The contract itself being made in writing and by the general agent of the company, and that and a precisely similar one having been acquiesced in since 1837 till 1853 or 1854, a period sufficient to quiet the title of real estate, and very extensive and valuable erections having been made in the faith of the contract, we should certainly regard the company as conclusively bound by so long acquiescence, unless there is something of a very conclusive character to encounter the presumption.

The company rely upon the instances in which the plaintiff has raised his gate, at the request of the proprietors of the grist mill. So far as this happened under the former contract it could not be of much force, as the transaction is only incidentally connected with the present, and was of very much less importance than the present one, being but a single wheel, and no erections made in faith of it, which would make it essential that the plaintiff should insist upon his rights *in limine.*

But under either contract it might be attributable to courtesy as well as submission to superior right. "I will give twice so much

to any well-deserving friend, but in the way of bargain I will cavil upon the ninth part of a hair."

It is also worthy of notice that this was not a concession to any counter claim of the defendants, but at most to the superior right of the grist mill proprietors. Their rights he must know, as they are upon the registry, and he must respect them, as they are superior to his own.

And at first it seemed to us that this must be a bar to the plaintiff's claim for a specific performance of this contract. For a court of equity will not decree a specific performance of a contract which it is not in the power of the party to perform. And as the defendants have first conveyed a right to the grist mill, they have no power to convey one to the plaintiff otherwise than subject to their former conveyance. And if the water in this canal were limited by physical laws, as it is where all the water in a stream is put to the use of machinery and there is still a liability to a deficiency, we think it would present an invincible obstacle to the redress asked.

But upon careful examination and reflection it is obvious that the principle alluded to has no just application to the present case. Here the supply of water is by means of an artificial canal, which, so far as appears, is capable of being deepened to any extent, and is connected with such a supply of water that there is in fact no difficulty in affording an ample supply of water for the grist mill and the plaintiff also.

If, then, the defendants really contracted to do it, we see no reason why they should not be required to do so. And it seems to us that upon the principles of law already adverted to, and the proof in this case, we can come to no other conclusion but that the company are bound by the contract as made, and a specific performance must be decreed.

Decree of chancellor reversed and case remanded, to pass a decree for the orator according to the prayer of the bill.